PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2410
_____

D.F., a minor, individually and by his
parent and legal guardian A.C.,
Appellant

v.

COLLINGSWOOD BOROUGH BOARD
OF EDUCATION, a/k/a Collingswood
Public Schools
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. Action No. 1-10-cv-00594)
District Judge: Honorable Joseph E. Irenas
_____

Argued June 4, 2012
_____

Before: SCIRICA, GREENAWAY, JR., and NYGAARD,
*Circuit Judges.*

(Opinion Filed: September 12, 2012)

Jamie Epstein (argued)
1101 Route 70 West
Cherry Hill, NJ 08002
        *Counsel for Appellant*

Richard L. Goldstein
Walter F. Kawalec, III (argued)
Marshall, Dennehey, Warner,
Coleman & Goggin
200 Lake Drive East, Suite 300
Cherry Hill, NJ 08002
        *Counsel for Appellee*

John D. Rue
Rafael Rosario (argued)
White & Case
1155 Avenue of the Americas
New York, NY 10036

Ruth Deale Lowenkron
Education Law Center
60 Park Place, Suite 300
New York, NY 07102
        *Counsel for Amici Curiae, Education Law Center, et al.*

_____

OPINION
_____

GREENAWAY, JR., *Circuit Judge*.

Appellant D.F. was a five-year-old kindergartener during the 2008-2009 school year, his first under the supervision of Appellee Collingswood Borough Board of Education ("Collingswood"). He had previously been educated in the Camden school system, which had identified him as a special needs student and developed an Individualized Education Plan ("IEP") for him. Collingswood adopted the Camden IEP in substantial part, with the consent of D.F.'s mother, A.C. In January 2009, A.C. filed a due process petition alleging violation of D.F.'s rights under the Individuals with Disabilities in Education Act ("IDEA"). Sometime later, she filed a second due process petition expanding the claims. D.F. and A.C. subsequently moved out of state, at which point the New Jersey Administrative Law Judge ("ALJ") dismissed the pending due process petitions as moot. D.F. filed this suit in the District Court challenging the ALJ's orders. The parties filed cross-motions for summary judgment and the District Court granted Collingswood's motion, thereby upholding the ALJ's orders. D.F. timely appealed.

We must now resolve three questions: (1) whether the out-of-state move rendered all of D.F.'s claims moot; (2) if the claims are not moot, whether summary judgment was nonetheless proper because D.F.'s IDEA rights were not violated; and (3) whether D.F. was a prevailing party for purposes of attorneys' fees. We hold that the District Court erred in determining that the claims were moot and in entering summary judgment. It correctly found that D.F. was not a prevailing party entitled to attorneys' fees. We therefore affirm in part, reverse in part, and remand this case to the District Court for further factual development.

# I. BACKGROUND

A. 2008

D.F., an African-American male with special educational needs, was enrolled in an inclusion[1] pre-school class in the Camden City Public Schools for the 2007-2008 school year. There were fewer than ten students in the class, supervised by four adults. According to the IEP generated in Camden, he exhibited characteristics consistent with Attention Deficit Hyperactivity Disorder ("ADHD") and Oppositional Defiant Disorder ("ODD"). (Appellant's App. 8.) Although his cognitive abilities were at or above grade level, he had difficulty with visual-motor integration skills. Generally speaking, he experienced problems with hyperactivity, aggression, distractibility, and impulsivity. In Camden, D.F. had experienced issues with throwing objects, hitting peers, running away, and temper tantrums. Once a Behavior Intervention Plan ("BIP") was created, his negative behaviors began to diminish.

The IEP required an extended school year program ("ESY") of at least thirty days, in a self-contained[2] behavioral disabilities program with counseling services. This summer program was intended to modify his aggressive and impulsive behaviors before he entered a regular kindergarten with support services in September 2008. The IEP specifically

---

[1] Inclusion classrooms educate special needs and typically developing children together.

[2] Unlike inclusion classrooms, self-contained classrooms educate only special needs children.

noted that D.F. would be at high risk for failure in a regular kindergarten without supportive services.

D.F. and his family moved to Collingswood, a suburb of Camden, in September 2008 and enrolled D.F. in Collingswood schools.[3] The IEP team in Collingswood essentially adopted the IEP developed in Camden. The team consisted of a case manager, D.F.'s regular education teacher, his special education teacher, a psychologist, and A.C. A.C. declined to have D.F. placed in the self-contained special education kindergarten because his brother was in that class. It is indisputable that D.F. was placed in a regular classroom, with typically developing children and pull-out sessions for speech and counseling. D.F. had no one-to-one aide or other supportive services in that regular kindergarten classroom.

Although the behavior plan from Camden remained part of D.F.'s IEP, it was not implemented in Collingswood, and he experienced behavioral issues in the early part of the school year. On November 19, 2008, A.C. requested that a functional behavior assessment of D.F. be performed, in hopes of addressing D.F.'s behavioral issues. Collingswood agreed. Philip Concors, a certified behavior analyst with whom Collingswood frequently works, performed the assessment.

---

[3] According to the 2010 census, the Borough of Collingswood is approximately eighty-two percent white. U.S. Census Bureau, 2010 Census Summary File 1.

B. Spring 2009

On January 8, 2009, Collingswood began providing D.F. with a one-to-one aide in the classroom.

A.C., initially unrepresented by counsel, filed a due process petition on January 21, 2009. She alleged that Collingswood had placed D.F. in a regular classroom and had failed to provide the one-to-one aide until January, in violation of the IEP. She also alleged that he had been subject to discipline without consideration of the fact that his behavior was a manifestation of his disability. Finally, she asserted that the IEP and behavior plan were incomplete because they did not include specific target behaviors, methods, and documentation processes, and because they were not developed from the baseline of a behavior assessment. The petition sought: 1) an independent psychiatric evaluation; 2) an independent behavioral assessment and a positive behavior intervention plan designed by a consultant who would oversee it; 3) compensatory education for the period of time D.F. did not have a one-to-one aide; 4) an ESY; and 5) a requirement that the IEP include proper goals and objectives.

By filing the petition, A.C. triggered the IDEA's "stay-put" requirement. Pursuant to 20 U.S.C. § 1415(j), the child who is the subject of due process proceedings "shall remain in [his] then-current educational placement . . . until all such proceedings have been completed." Approximately a month after the filing of the petition, Collingswood conducted an IEP meeting at which it implemented a behavior plan based on Concors' evaluation. The plan specifically approved the

use of physical restraints on D.F. A.C. refused to attend this meeting, although she was part of the IEP team. She argued that the stay-put requirement mandated continuation of the old IEP until the ALJ held otherwise.

In March 2009, Collingswood filed a motion to dismiss the second claim in the petition, which sought an independent psychiatric evaluation and an independent behavioral assessment. Collingswood argued that A.C. had not requested them before she filed the petition, as she was required to do under New Jersey law. Collingswood also claimed that it had already agreed to provide them. D.F. argues to this Court that, although Collingswood has repeatedly represented to the ALJ that it agreed to provide these evaluations at its own expense, using the experts provided by A.C., it stalled for five months. In June 2009, the ALJ ordered that Collingswood pay for the evaluations.

D.F. remained in the regular classroom, with an aide, through April 2009. There were numerous incidents involving his behavior, including some in which he was physically aggressive toward other students, his aide, and other adults in the building. (Appellant's App. 64-69.) Parents of other students in his class became upset with his presence in the classroom and even organized online to agitate for his removal from the classroom.

Toward the close of the 2008-2009 school year, the IEP team met again and proposed an out-of-district placement for D.F. Collingswood sent A.C. a letter seeking her authorization to send D.F.'s records to several out-of-district programs so that those programs could determine whether they would accept him as a student. A.C. refused, invoking her stay-put rights.

7

Apparently as a result of her frustration with the use of restraints against D.F. and his treatment in the classroom, A.C. unilaterally decided to keep D.F. at home for the last six weeks of the school year. D.F.'s IEP required an ESY, and Collingswood provided D.F. with tutoring in a vacant classroom during that summer. It was A.C.'s opinion that this placement violated the IEP, which provided that ESY be in a self-contained classroom. (Appellant's App. 80-81.)[4]

C. 2009-2010 Academic Year

D.F. began the 2009 school year in a regular classroom with a one-to-one aide. His behavior problems continued. In late August, Collingswood filed for emergent relief, seeking a change in D.F.'s stay-put status so that it could officially implement the behavior intervention plan that was designed at the February 2009 IEP meeting and which had, arguably, been in use unofficially in the spring of 2009. In the alternative, Collingswood sought to place D.F. outside the district and asked that the ALJ order A.C. to authorize the release of D.F.'s records for this purpose. The ALJ denied this motion without prejudice, as Collingswood had failed to include any facts relating to the current school year.

In September 2009, D.F.'s chosen expert, Dr. Kathleen McCabe-Odri, completed her functional behavior assessment and his second expert, Dr. Robertson Tucker, completed his psychiatric evaluation. Dr. McCabe-Odri observed D.F. at

---

[4] Later, in September 2009, A.C. filed for compensatory education for the hours of IEP-approved education lost during the ESY. This motion was eventually denied as moot along with the others.

home and in his classroom. She concluded that "the overall behavior system is severely inadequate in addressing [D.F.'s] behavioral and social challenges." (Appellant's App. 141.) She recommended particular behavior intervention strategies and suggested that the Collingswood staff would benefit from certain training. Finally, she concluded that restraints were not recommended for D.F. (*Id.* at 143.)

Dr. Tucker recommended a "highly structured first grade class which offers support services and a full-time one-to-one aide providing behavior modification instead of resorting to restraint." (*Id.* at 133.) He also indicated that restraints were contraindicated in most situations and that D.F. should receive social skills training and counseling in school.

On October 29, Collingswood again sought emergent relief, this time seeking only an out-of-district placement for D.F. It based the request on a number of fall 2009 disruptive incidents, in which D.F.'s behavior escalated to the point that he punched , scratched and hit teachers, hit other students, ran out of classrooms, and ripped up other students' work. The ALJ found that D.F's behavior placed him and students around him at risk of harm and therefore ordered that D.F. be placed on home instruction until a suitable placement in a highly structured setting with behavioral supports was found. The ALJ further ordered A.C. to cooperate in the process of finding him an out-of-district placement.

In early December, Collingswood informed A.C. that The Archway School had accepted D.F. A.C. refused to send D.F. to Archway without a new IEP and stated that she would not cooperate in the development of a new IEP until ordered by the ALJ to do so. D.F. was still on home instruction in

9

February 2010, when A.C. indicated at a hearing that she would prefer that D.F. be placed at the Cherrywood School, run by Dr. McCabe-Odri. Cherrywood was primarily a school for autistic pre-schoolers, and the district argued that it was not an appropriate placement. Cherrywood staff submitted an affidavit describing the Collingwood staff's tour of Cherrywood, at which Dr. Plescia, head of special education for Collingswood, allegedly referred to D.F. as "a predator," "the devil," "street smart," and highly aggressive." (Appellant's App. 193-94.)

The parties failed to agree on a placement, and, on April 1, 2010, the ALJ entered an order finding Archway to be the appropriate placement and changing D.F.'s stay-put to place him there. (*Id.* at 203.) A.C. appealed and did not send D.F. to Archway.

D. Conclusion of the Case Before the ALJ

On July 7, 2010, D.F.'s counsel advised Collingswood that D.F. and A.C. had moved to Georgia and that they would be withdrawing all claims except those for compensatory education.

On July 15, D.F. filed a second petition for due process,[5] nearly identical to the first except that it sought, as its sole relief, compensatory education for "the period of time Collingswood failed to provide a free and appropriate education in the least restrictive environment." (Appellant's App. 215.) This represented an expansion from the initial

---

[5] This petition was later referred to by the ALJ as a motion to amend the original petition. *See* footnote 6, *infra*.

10

petition, which had sought compensatory education only for the time period before the one-to-one aide was initially provided. This petition also alleged that restraints had been improperly used on D.F. Collingswood filed a Notice of Insufficiency, alleging that D.F. had failed to plead specific issues, relevant facts, and relief sought with regard to the restraints. The ALJ entered an order dismissing the new petition for insufficiency on July 27, the same day on which he was made aware that D.F. had moved out of state.

On August 4, the ALJ issued an order dismissing all remaining claims and closing the case. (Appellant's App. 237-41.) D.F. had conceded that the move rendered moot all the claims except those for compensatory education. The ALJ, however, denied the motion to amend the petition to expand the compensatory education claim, finding both undue delay and mootness.[6] The ALJ then dismissed both pending petitions – one filed by D.F. and one by Collingswood – as moot.

---

[6] D.F. had, in fact, filed a Motion to Amend in May 2009, but the ALJ stated that the petitioner had delayed seeking amendment of the claim for "well over a year." (Appellant's App. 240.) Since May 2009 was less than six months after the filing of the initial petition, the ALJ's holding appears to refer instead to the second due process petition, filed in July 2010.

11

E.  District Court Proceedings

        D.F. originally filed a complaint in the District Court on February 3, 2010, appealing the November 6 order of the ALJ that placed him on home instruction.  The District Court case proceeded in tandem with the case before the ALJ throughout the spring and summer.  After D.F. amended the complaint several times, the parties filed cross-motions for summary judgment.

        The District Court granted Collingswood's summary judgment motion and entered judgment in its favor.  Engaging in plenary review of the ALJ's decision, while giving "due weight" to the ALJ's factual findings, the District Court held that "the present dispute ha[d] been rendered moot by D.F.'s move from New Jersey to Georgia."  *D.F. v. Collingswood Pub. Sch.*, 804 F. Supp. 2d 250, 255 (D.N.J. 2011).  It noted that all compensatory education claims are rendered moot by a child's move out of a school district.  However, several of the orders on appeal concerned the appropriate placement for D.F., and one concerned use of restraints against him.  The Court found itself unable to award relief if it held in D.F.'s favor on these issues, particularly in the form of compensatory education.

        With regard to the remaining order on appeal, the August 4 dismissal for mootness, the District Court found that it was also without power to award compensatory education as relief.  Because D.F. had voluntarily moved to Georgia, that state had "necessarily assumed the obligation to evaluate D.F.'s educational needs as they currently exist and provide him with a FAPE and any necessary special education

12

services." *Id.* In a footnote, the Court also held that "D.F.'s claim for compensatory education for the period of time he was not provided a one-to-one aide also fails on the merits because Collingswood did not deny him a FAPE during that period." *Id.* at 256 n.6. Essentially, it found that the IEP never required a one-to-one aide and that Collingswood acted swiftly to remediate the situation once it was discovered. It did not address the other denials of FAPE alleged.

Finally, the Court declined to award attorneys' fees to D.F. on the basis of prevailing party status. It found that there was no causal connection between the filing of the petition and Collingswood's provision of the independent assessments, as D.F. had not properly requested these assessments before filing for due process. *Id.* at 256-57.

D.F. filed a timely notice of appeal.

## II.  JURISDICTION AND STANDARD OF REVIEW

Pursuant to the IDEA, 20 U.S.C. § 1415(i)(2), the District Court had jurisdiction over the appeal from the state administrative proceedings. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

Summary judgment is appropriate "where the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010) (quoting *Nicini v. Morra*, 212 F.3d 798, 805-06 (3d Cir. 2000) (en banc) (citing Fed. R. Civ. P.

56(c))).[7]  In an IDEA case, our review of the District Court's legal conclusions is de novo, *Steven I. v. Cent. Bucks Sch. Dist.*, 618 F.3d 411, 412 n.2 (3d Cir. 2010), and our review of the District Court's factual findings is for clear error.  *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006).

"This court reviews the District Court's denial of attorneys' fees for abuse of discretion. . . .  However, if the District Court denied the fees based on its conclusions on questions of law, our review is plenary."  *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006) (citation omitted).

## III. ANALYSIS

### A. Mootness

D.F. argues that his move to Georgia did not render moot his claims for compensatory education, as the District Court determined.

Compensatory education is a judicially-created remedy that has received the imprimatur of this Court.  *Lester H. v. Gilhool*, 916 F.2d 865 (3d Cir. 1990).  The IDEA grants a

---

[7] Fed. R. Civ. P. 56 was revised in 2010.  The standard previously set forth in subsection (c) is now codified as subsection (a).  The language of this subsection is unchanged, except for "one word — genuine 'issue' bec[ame] genuine 'dispute.'"  Fed. R. Civ. P. 56 advisory committee's note, 2010 amend.

district court reviewing an IDEA claim the authority to grant whatever relief it "determines is appropriate." 20 U.S.C. § 1415(i)(2). The Supreme Court has held that if parents have paid for a disabled child's education because the public schools were failing to provide FAPE, reimbursement of this tuition constitutes appropriate relief. *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985).[8] The Court found that any other result would render "the child's right to a free appropriate public education, the parents' right to participate fully in developing a proper IEP, and all of the procedural safeguards . . . less than complete." *Id.* Since this could not have been Congress's intent, the Court was confident that "Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case." *Id.*

In *Miener ex rel. Miener v. State of Missouri*, the Eighth Circuit extended this rationale to countenance the award of compensatory educational services, that is, those educational services that a special needs student ought to have received during the period of time that FAPE was not provided. 800 F.2d 749 (8th Cir. 1986). As in the case of the reimbursement remedy approved in *Burlington*, the Court found that "imposing liability for compensatory educational services on the defendants 'merely requires [them] to

---

[8] This case addressed the the Education of the Handicapped Act (EHA), the predecessor statute to the IDEA. EHA jurisprudence concerning appropriate remedies has, however, been incorporated wholesale into IDEA jurisprudence. *See, e.g.*, *Ferren C. v. Sch. Dist. of Phila.,* 612 F.3d 712, 718 (3d Cir. 2010) (addressing IDEA compensatory education claim by citing *Burlington*'s analysis of the EHA).

15

belatedly pay expenses that [they] should have paid all along.'" *Id.* at 753 (quoting *Burlington*, 471 U.S. at 370-71). As for the policy goals of the IDEA, the Court was confident "that Congress did not intend the child's entitlement to a free education to turn upon her parent's ability to 'front' its costs." *Id.* at 753.

We adopted these conclusions in *Lester H. v. Gilhool*, 916 F.2d at 872-73. We concluded "that Congress, by allowing the courts to fashion an appropriate remedy to cure the deprivation of a child's right to a free appropriate public education, did not intend to offer a remedy only to those parents able to afford an alternative private education." *Id.* at 873.

Acknowledging that compensatory education was a potentially valid remedy, the District Court nonetheless determined that D.F.'s claims were moot. 804 F. Supp. 2d at 255. Because the judicial power extends only to cases and controversies., U.S. Const. art. III, § 2, a claim is moot if no such case or controversy exists. "[T]he requirement that an action involve a live case or controversy extends through all phases of litigation . . ." *Cnty. of Morris v. Nationalist Movement*, 273 F.3d 527, 533 (3d Cir. 2001). Accordingly, if "developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." *Id.* (quoting *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698-99 (3d Cir. 1996)).

Admittedly, "[c]ase law in this Circuit addressing the effect of moving out of a school district during the course of litigation for compensatory education is spotty." *N.P. v. East*

16

*Orange Bd. of Educ.*, No. 06-5130, 2011 WL 463037, at \*4 (D.N.J. Feb. 3, 2011). We have not squarely addressed the question, and we certainly have not done so in the context of an out-of-state move. We have, however, stated that compensatory education is an equitable remedy that compensates a special needs student "for rights the district already denied him." *Lester H.*, 916 F.2d at 872. Thus, several District Courts within this Circuit have held that an out-of-district move does not render claims for compensatory education moot. *N.P.*, 2011 WL 463037, at \*5 (granting compensatory education to student who had moved to adjacent school district while explicitly limiting ruling to in-state move situation); *Neshaminy Sch. Dist. v. Karla B.*, No. 96-3865, 1997 WL 137197, at \*5-\*6 (E.D. Pa. Mar. 20, 1997) (finding compensatory education claim not mooted by out-of-district move). The Eighth Circuit also has held that an out-of-district move does not moot a claim for compensatory education. *Indep. Sch. Dist. No. 284 v. A.C. ex rel. C.C.*, 258 F.3d 769, 774-75 (8th Cir. 2001).

The District Court, like the ALJ, relied heavily on the one District Court decision within the Third Circuit that holds that a compensatory education claim is rendered moot by a move out of state. In *S.N. v. Old Bridge Twp. Bd. of Educ.*, No. 04-517, 2006 WL 3333138 (D.N.J. 2006), the court dismissed S.N.'s claim as moot. However, it focused on the fact that S.N. sought "prospective relief, which would be impossible to grant." *Id.* at \*2. S.N. had originally sought only a revised IEP, and only in response to the motion to dismiss for mootness did he seek to amend his prayer for relief to ask for reimbursement of the costs of hiring a life coach. *Id.* The court did specifically address the question of compensatory education, and it found that, given the move

17

out of state and the fact that S.N.'s parents had not fronted money for his education while he lived in New Jersey, "Plaintiffs' own actions have made any relief, including an award [of] compensatory education, impossible." *Id.* at *4 (sic).

*S.N.*, an unpublished decision of the District Court, is neither persuasive nor binding. Continuity of residence cannot be prerequisite to the grant of compensatory education. As the *Neshaminy* court noted, a rule that rendered IDEA claims for compensatory education moot upon a move out of district would allow "a school district [to] simply stop providing required services to a student with the underlying motive of inducing this student to move from the district, thus removing any future obligation under IDEA which the district may owe to the student," and thereby frustrating the purpose of the IDEA. *Neshaminy Sch. Dist.*, 1997 WL 137197, at *6. We find this rationale indisputably persuasive.

The IDEA works because each school district bears the obligation to educate special needs students, often at substantial cost. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 262 (3d Cir. 2007) ("It is undisputed that the District is the local education agency responsible for providing a FAPE to [the student]."). To comply with the IDEA, a school district no longer responsible for educating a child must still be held responsible for its past transgressions. Were we to uphold the District Court's ruling, we would create an enormous loophole in that obligation and thereby substantially weaken the IDEA's protections. We therefore hold that a claim for compensatory education is not rendered moot by an out-of-district move, even if that move takes the child out of state.

18

Ruling otherwise would particularly impact low-income special needs students. Because compensatory education is at issue only when tuition reimbursement is not, it is implicated only where parents could not afford to "front" the costs of a child's education. *See Miener*, 800 F.2d at 753. Accordingly, low-income families, disproportionately likely to have a disabled child, would be particularly burdened by a holding that compensatory education cannot be obtained after a move. *See* U.S. Dep't of Educ., Office of Special Educ. And Rehab. Servs., 25th Annual Report to Cong. on the Implementation of the Individuals with Disabilities Education Act Vol. 1, 32 (2003), *available at* http://www2.ed.gov/about/reports/annual/osep/2003/25th-vol-1-sec-1.pdf. We cannot reward school districts who fail to provide FAPE to special education students until those students move.

The District Court asserted that, apparently because D.F. moved out of state, Georgia "has necessarily assumed the obligation to evaluate D.F.'s educational needs as they currently exist and provide him with a FAPE and any necessary special education services." 804 F. Supp. 2d at 255. As a result, compensatory educational services are "subsumed within the education he is currently receiving from Georgia," and the court can grant him no effective relief. *Id.*

This "subsumption" theory is incompatible with the very notion of compensatory education as a remedy based on past harms and it is therefore not supported by our case law.[9]

---

[9] Further, we see no basis to distinguish between out-of-district, but in-state, moves and out-of-state moves in the IDEA or in case law. Any attempt to draw such a distinction

19

*See Lester H.*, 916 F.2d at 872 (noting compensatory education is a remedy for rights already denied to a special needs student). We must therefore reject the contention propounded by Collingswood at oral argument that compensatory education would remain available to D.F. had he transferred to a private school or begun home schooling, but that his transfer to another public school district with its own IDEA obligations renders his claim moot.

Further, the District Court erred in concluding that there was no compensatory education that Collingswood could provide once D.F. lived in Georgia. One accepted form of compensatory education relief is the establishment of a fund to be spent on the child's education, which Collingswood would certainly be able to provide if FAPE was found to have been denied. *See, e.g.*, *Ferren C.*, 612 F.3d 712 (upholding compensatory education fund as appropriate under IDEA); *Heather D. v. Northampton Area Sch. Dist.*, 511 F. Supp. 2d 549, 562 (E.D. Pa. 2007) (utilizing fund as compensatory education remedy). Further, we have noted that there is no "case law from our sister circuits that supports the argument that a court's power to grant equitable relief

would raise concerns with regard to the plaintiffs' rights to interstate travel. *See Saenz v. Roe*, 526 U.S. 489, 498 (1999) ("[T]he 'constitutional right to travel from one State to another' is firmly embedded in our jurisprudence." (quoting *United States v. Guest*, 383 U.S. 745, 757 (1966))). *But see N.P.*, 2011 WL 463037, at *5 (distinguishing case from *S.N.* because N.P. "moved to an adjacent school district, rather than out of the state entirely").

under the IDEA is simply limited to monetary awards."
*Ferren C.*, 612 F.3d at 719.

Appropriate remedies under the IDEA are determined on a case-by-case basis. "In each case, a court will evaluate the specific type of relief that is appropriate to ensure that a student is fully compensated for a school district's past violations of his or her rights under the IDEA and develop an appropriate equitable award." *Id.* at 720. The District Court also could have ordered Collingswood to pay D.F.'s new district or to contract with a local provider in his new home in order to provide tutoring, counseling, or other support services. *See Pihl v. Mass. Dep't. of Educ.*, 9 F.3d 184, 188 n.8 (1st Cir. 1993) (noting that compensatory education can take many forms, including tutoring and summer school). As Collingswood conceded at oral argument, such inter-district contracting is a regular part of the resolution of IDEA claims.

Because the very purpose of the IDEA would be undermined by a contrary holding, we find that the District Court erred in asserting that D.F.'s claims for compensatory education were rendered moot when he moved to another state. Of course, we do not intend to restrict the potential forms of compensatory education to those discussed above. Indeed, we encourage the District Court to consider any form of compensatory education proposed.

21

B. Denial of FAPE

Because we find that D.F.'s claims were not rendered moot by his move out of state, we turn next to Collingswood's argument in the alternative, that D.F. is not entitled to compensatory education because he experienced no denial of FAPE.

The IDEA mandates that all states receiving federal education funding must provide FAPE for all disabled children. *Id.* at 198. "The right to a FAPE ensures that students with special education needs receive the type of education that will 'prepare them for further education, employment, and independent living.'" *Ferren C.*, 612 F.3d at 717 (quoting 20 U.S.C. § 1400(d)(1)(A)). The IDEA also requires that disabled children be provided that education in the least restrictive environment ("LRE"), that is, educated alongside non-disabled children except when "the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A).

The IEP is the means of ensuring that each special needs child receives FAPE:

> [A] school district that knows or should know that a child has an inappropriate [IEP] or is not receiving more than a *de minimis* educational benefit must correct the situation. . . . [I]f it fails to do so, a disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time

22

> reasonably required for the school district to
> rectify the problem.

*M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996). This is not "a bad faith or egregious circumstances standard." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 249 (3d Cir. 1999), *superseded by statute on other grounds as recognized by P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727 (3d Cir. 2009). Indeed, a child's entitlement to FAPE is not "abridged because the [school] district's behavior did not rise to the level of slothfulness or bad faith." *M.C.*, 81 F.3d at 397.

The District Court found, in a footnote, that "D.F.'s claim for compensatory education for the period of time he was not provided a one-to-one aide also fails on the merits because Collingswood did not deny him a FAPE during that period." 804 F. Supp. 2d. at 255 n.6. This conclusion was supported with record evidence including the creation of the September 4, 2009 IEP with A.C.'s consent, the conducting of the behavior assessment by Phillip Concors in November 2009, and the provision of the one-to-one aide in January.[10] All of this showed, in the District Court's view, that

---

[10] The District Court, appropriately, engaged in "modified de novo" review of the ALJ's decision. 804 F. Supp. 2d at 254; s*ee D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010). "Under this standard, a district court must give 'due weight' and deference to the findings in the administrative proceedings." *Id.* (citation omitted). However, the District Court did not address the ALJ's highly relevant statement that "both parties [agree] that the IEP's flawed." (Appellant's App. 282).

23

Collingswood "acted promptly to attempt to resolve D.F.'s educational issues and meet his educational needs." *Id.* Although we note that parental consent to an IEP does not mean that FAPE was provided, *Ridgewood*, 172 F.3d at 250, we nonetheless do not find the District Court's conclusion to this question of fact to be clearly erroneous.

However, our inquiry cannot conclude there. D.F.'s original petition sought compensatory education only for the period of time during which he was without a one-to-one aide, a claim which the District Court rejected with the explanation noted above. Nonetheless, at the time of the ALJ's August 4, 2010 order, there were three other pending motions that sought compensatory education for other alleged violations of D.F.'s right to FAPE. First, in his May 26, 2009 filing, D.F. sought to expand the original petition so that, instead of addressing the period of time he was denied a one-to-one aide, it would cover any denial of FAPE, presumably for any reason, during the period of time from September 2008-January 2009. (Appellant's App. 270-71.) Second, on September 16, 2009, D.F. moved for compensatory education to remedy alleged violations of FAPE based on his summer 2009 ESY placement. (*Id.* at 77-86.) Third, on July 15, 2010, D.F. filed an additional due process petition seeking compensatory education for the entire period of time D.F. had not received FAPE in Collingswood, with specific reference to improper discipline and use of restraints.[11] (*Id.* at 214-15.)

---

[11] The period for which D.F. is potentially entitled to receive compensatory education ended on July 1, 2010, when D.F. moved out of Collingswood.

The ALJ dismissed this last petition for insufficiency, on the ground that it did not contain the necessary information relating to the restraints claim. Then, in her August 4, 2010 decision, in which she declared all the claims to be moot, the ALJ specifically and separately denied "petitioner's motion to amend to expand its request for compensatory education." [12] (*Id.* at 240.) As grounds for this decision, she relied on *S.N.*, wherein a request to amend the claim for compensatory education was denied based on undue delay and mootness, and she cited those same reasons in denying D.F.'s motion. She made no specific factual findings regarding any of the claims for compensatory education.

The District Court noted that the ALJ had denied the request to expand the compensatory education claim based on undue delay and mootness. 804 F. Supp. 2d at 256 n.5. Relying upon mootness to dispose of the claims, though, the District Court did not make any factual findings that related to the claim for compensatory education for violations of FAPE beyond the absence of a one-to-one aide during the September 2008-January 2009 period, nor any related to the summer 2009 compensatory education claim. Indeed, the District Court's opinion suggests that D.F. sought only "compensatory education for the period that he was not provided with a one-to-one aide," *id.* at 253, although D.F.'s cross-motion for summary judgment made clear that his compensatory education claim was broader.

Because the District Court did speak substantively on the entirety of D.F.'s claims for compensatory education, our holding that these claims are not moot requires us to remand

---

[12] See footnote 6, *supra*.

this matter to the District Court for factual findings on all of the alleged violations of FAPE. We note that the July 2010 petition was dismissed for insufficiency and thus the claims found solely there are not affected by our reversal of the District Court's mootness ruling. We further note that, because D.F. had not presented any testimony before the ALJ when the ALJ declared the claims to be moot, further development of the record is likely to be necessary before D.F.'s claims for compensatory education can be properly evaluated.

C. Attorneys' Fees

D.F. seeks attorneys' fees on the ground that the ALJ's order mandating that Collingswood provide the independent psychiatric evaluation and independent behavior analysis render him a prevailing party. The IDEA provides that a district court may, in its discretion, award "reasonable attorneys' fees" to a prevailing party. 20 U.S.C. §1415(i)(3)(B)(i)(I). Generally speaking, a prevailing party is one who "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 271 (3d Cir. 2002) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). We determine whether a party is a prevailing party using a two-pronged test: "First, 'whether plaintiffs achieved relief,' and second, 'whether there is a causal connection between the litigation and the relief from the defendant.'" *Id.* (quoting *Wheeler v. Towanda Area Sch. Dist.*, 950 F.2d 128, 131 (3d Cir. 1991)).

To satisfy the first prong, the relief obtained need not be all of the relief requested, nor must the plaintiff ultimately win the case; rather, the plaintiff must merely secure "some of

26

the benefit sought in the lawsuit." *Id.* (quoting *Wheeler*, 950 F.2d at 131). To satisfy the second prong, demonstrating causation, a plaintiff must show that litigation "was a material contributing factor in bringing about the events that resulted in obtaining the desired relief." *Wheeler*, 950 F.2d at 132 (citation omitted). Alternatively, the plaintiff can prevail on a catalyst theory, whereby "even though the litigation did not result in a favorable judgment, the pressure of the lawsuit was a material contributing factor in bringing about extrajudicial relief." *Id.*

The District Court found that D.F. could not demonstrate causation, and so it did not engage in any analysis as to whether he had succeeded on a significant issue. It grounded its holding on the fact that A.C. had failed to make known to Collingswood her desire to have the independent evaluations performed before she filed for due process. New Jersey mandates that "[i]f a parent seeks an independent evaluation in an area not assessed as part of an initial evaluation or a reevaluation, the school district shall first have the opportunity to conduct the requested evaluation." N.J. Admin. Code § 6A:14-2.5(c)(1). The District Court found that Collingswood had not been given this opportunity; moreover, record evidence showed that Collingswood had been willing to provide the independent evaluations from the time the due process petition was filed. As a result, the litigation could not be said to have caused the result, and D.F. could not be a prevailing party entitled to attorneys' fees.

D.F. asserts before this Court that the petition was filed in January and Collingswood agreed in writing in early February to provide the evaluations, but that the ALJ nonetheless felt the need to issue an order on June 22 ordering

27

Collingswood to provide the evaluations at its expense. D.F. therefore argues that Collingswood delayed and obstructed provision of the evaluations, as there would have been no need to issue an order in June if Collingswood had complied in a timely fashion. However, there is evidence in the record that A.C. did not provide the names of the experts she had selected until June. Collingswood apparently objected to their qualifications, leading the ALJ to issue the order.

Thus, we cannot find that the District Court abused its discretion in determining that the litigation did not cause Collingswood to agree to provide the evaluations. Collingswood had agreed from the outset of the litigation to provide them and indeed, might have provided them without litigation if D.F. had fully complied with New Jersey regulations in requesting the evaluations.

## IV. CONCLUSION

For the reasons set forth above, we will affirm the decision of the District Court in part, vacate in part, and remand for further proceedings.

SCIRICA, *Circuit Judge*, concurring.

I agree with the Court's disposition of this case.

This case presents an unfortunate situation. D.F. had significant special educational needs requiring accommodation and presenting a significant challenge to his inclusion in a general education classroom. Apparently, a contentious relationship developed between A.C.—D.F.'s mother—and school officials, impeding cooperation and turning the question of the proper education for D.F. into a prolonged litigious struggle involving dueling experts. These circumstances put D.F.'s teachers into a difficult position, caught between their legal duties and responsibilities to D.F., their responsibility to safeguard other students,[1] and the legal obligations imposed in the course of the due process proceedings, particularly the stay-put requirement triggered under 20 U.S.C. § 1415(j).

I read the relevant course of events as follows. At D.F.'s initial IEP meeting in fall 2008 when D.F. transferred into Collingswood from Camden, A.C. requested that D.F. not be placed in the small-class special education kindergarten classroom, as recommended by his Camden IEP, because his brother was in that class; the school accordingly placed D.F. into a regular education classroom. When it became apparent that the placement was inadequate,

---

[1] As the Court notes, by fall 2009 D.F.'s actions, including repeated physical attacks on students and teachers, posed a serious risk of harm to himself and others.

1

Collingswood agreed to A.C.'s request that a functional behavior assessment be performed and began to provide a one-to-one classroom aide prior to A.C.'s filing a due process petition on January 21, 2009. The petition triggered the stay-put requirement. The school developed an additional IEP to accommodate D.F., but A.C. declined to participate.[2] Meanwhile, D.F.'s behavior continued to disrupt classes significantly throughout spring 2009. At the end of the school year, the school district proposed an out-of-district placement for D.F., but A.C. insisted on her son's stay-put rights. In August, the school district filed a motion for emergent relief to modify the stay-put order so that it could implement the February 2009 IEP or seek an alternative placement for D.F. A.C. opposed this motion, and the ALJ denied the district's request without prejudice. After the events in fall 2009, Collingswood again filed for emergent relief, seeking only placement outside the district. The ALJ granted the motion, placing D.F. on home instruction, and

---

[2] As the Court states, this IEP "specifically approved the use of physical restraints on D.F." The February 26, 2009 IEP called for the use of "district-approved Crisis Prevention/Intervention (CP/I) techniques" in the event that D.F. "is presenting a significant and immediate risk of injury to self or others." (Appellant's App. 62-63). Among the possible interventions were various "Personal Emergency Interventions" that evidently involved school personnel holding D.F. until he displayed safe behavior. The record provides only two pages of what was apparently a twelve-page IEP.

2

ordered that A.C. cooperate with finding a placement. D.F. was accepted to the Archway School, but A.C. declined to allow his transfer there. The ALJ subsequently found Archway to be the appropriate placement. A.C. appealed and did not send D.F. to Archway; she then moved to Georgia, mooting all relief except, as we now hold, the compensatory education claim.

I agree with the Court that resolution of whether D.F. received FAPE during the relevant time period is a question for the District Court in the first instance. I also agree that more fact-finding may be warranted.